Cite as 2026 Ark. App. 242

# ARKANSAS COURT OF APPEALS
## DIVISION II
### No. CR-25-466

| | |
|---|---|
| RACHAEL LYNN DUKES<br><br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br><br>APPELLEE | Opinion Delivered: April 22, 2026<br><br>APPEAL FROM THE CRAWFORD COUNTY CIRCUIT COURT [NO. 17CR-24-278]<br><br>HONORABLE MARC MCCUNE, JUDGE<br><br>AFFIRMED IN PART; REVERSED AND DISMISSED IN PART |

**RAYMOND R. ABRAMSON, Judge**

A Crawford County jury found Rachael Dukes guilty of three counts of introduction of a controlled substance into the body of another person—specifically, MC1, MC2, and MC3 (counts 1, 2, and 3, respectively); and one count of first-degree murder (count 4) with an enhancement because the offense occurred in the presence of a minor. Dukes brings this appeal, arguing (1) that there was insufficient evidence to support her conviction for first-degree murder under a theory of felony murder; (2) that there was insufficient evidence to support her convictions for counts 2 and 3;[1] and (3) that the circuit court erred when it

---

[1]Dukes does not appeal her conviction for introduction of a controlled substance into MC1.

allowed evidence of Dukes's prior DHS involvement under Arkansas Rule of Evidence 404(b). We affirm in part and reverse and dismiss in part.

I. *Background*

On March 30, 2024, Crawford County 911 received a call concerning an infant, later identified as MC1, who was not breathing. MC1 was transported to Baptist Health in Van Buren where he passed away. At the time of his death, MC1 was three months and two days old. MC1's death was initially investigated as a sudden, unexplained infant death. Van Buren Police Lieutenants Jay Baker and Randall Allen interviewed Dukes and asked her to describe what occurred during the time up to and including when she found MC1 unresponsive. She told them that MC1 had a small cough and some mild congestion that she treated with some cough medicine but that MC1 was otherwise fine when she woke up in the early morning to give him his bottle before going back to sleep. When she woke up later that morning, she noticed that MC1 was unresponsive in his basinet, and she ran to her neighbor's apartment. The officers collected the bottle Dukes used to feed MC1 before his death. Dukes denied that she was using any controlled substances at the time.

On May 21, 2024, MC1's toxicology report was returned, and it reflected that MC1 had methamphetamine in his system. Baker interviewed Dukes again, and Dukes professed to have no knowledge of how the methamphetamine ended up in MC1's system. Thereafter, the crime lab tested the liquid from the bottle collected after MC1's death and determined that it was positive for the presence of methamphetamine. During this period, Lieutenant Baker was further informed that MC1 had a healing fracture on the back of his skull. He

then reinterviewed Dukes, who said that MC1 had fallen from her bed to the floor a couple of weeks before his death, but at the time, she did not believe he had fallen hard. The medical examiner testified that the fracture on MC1's skull was not consistent with a fall to a flat surface, but rather was the result of blunt-force trauma.

After executing numerous search warrants, Lieutenant Baker found a series of text messages from Dukes. The text messages show that in the months leading up to MC1's death, Dukes texted various individuals seeking to use methamphetamine with them and/or deal controlled substances to them. As an example, on February 28, Dukes texted an individual: "Hey, I have a bowl loaded if you want to come smoke?" On March 16, 2024, Dukes texted Ashley Morse, a friend and witness for the State: "Hey, Ashley, I need your help. I can't find that eight ball anywhere." Similarly, on March 17, Dukes texted Morse: "Do you want some sh**? If so, come by my bathroom and get it." Likewise, in the hours right before MC1's death, Dukes texted Morse, "Are you going to bring me any sh**?" Lieutenant Baker testified that this was in the context of Dukes requesting an "8 ball" of methamphetamine from Morse. As for dealing controlled substances, the day before MC1 died, Dukes texted the following to someone: "Hey, I know someone who has Some Roxy 15s, do you want any?" In fact, the evening of MC1's death, Dukes conducted another drug transaction with an individual identified only as "Max."

Following the autopsy and toxicology results, the medical examiner determined that MC1's cause of death was

environmental neglect, with methamphetamine exposure, with other significant or contributory conditions being a blunt force head injury, and manner of death is homicide.

The medical examiner testified that it was not possible that the methamphetamine ingestion was accidental in this case, mainly because MC1 was not yet mobile and would have been unable to accidentally ingest methamphetamine. She further testified that there is no "safe level" of methamphetamine for a child.

With the new information, Lieutenants Wing and Allen interviewed Dukes for the fourth time. Eventually, Dukes admitted that she had taken a small amount of methamphetamine in a gum wrapper with her into the kitchen to make MC1's bottle. Dukes disclosed that before she put any formula in the bottle, she accidentally dropped the gum wrapper into the empty bottle. She removed the gum wrapper and made the formula without washing out the bottle. She then told officers she snorted the rest of the methamphetamine before she fed MC1. Finally, Dukes told the officers that she thought the methamphetamine "would help [MC1] breathe."

After the toxicology results came back, the Arkansas Department of Human Services (DHS) also became involved in the case regarding two-year-old MC2 and three-year-old MC3. Coby Minkus, an investigator with Crawford County DHS, testified that three prior cases had been opened against Dukes. Two were opened because Dukes tested positive for controlled substances when she gave birth to MC2 and MC3. Dukes conceded that she had used controlled substances three or four times while pregnant with MC2. When initially questioned by officers after MC1's death, Dukes told them that the last time she had taken

methamphetamine was while she was pregnant with MC3. The third case was opened because Dukes failed to do a "room in" with MC1 so that he could be released from the NICU. After MC1's death, DHS requested hair-follicle tests for MC2 and MC3, which were performed at Arkansas Children's Hospital on May 29, 2024.

Dr. Karen Farst, an expert in pediatric medicine testifying for the State, explained that the hair-follicle test requires that the hair shaft be pulverized without being cleaned first, so any drugs on the surface may also show up in the results. Dr. Farst testified that MC3's hair follicle tested positive for methamphetamine and amphetamine, and MC2's hair follicle tested positive for methamphetamine. Dr. Farst testified that it was not surprising to find amphetamine in MC3's sample because when methamphetamine is metabolized, or "broken down," it creates amphetamine; moreover, Dr. Farst testified that the ratio of methamphetamine to amphetamine in MC3's system was exactly what they would expect if the amphetamine was the result of metabolization. Dr. Farst testified that the two most common ways for children to test positive for methamphetamine are (1) when methamphetamine is smoked in the presence of the child and it "adhere[s] or [is] attached to the outer surface of the hair shaft" and (2) when children are near methamphetamine residue and they put their hands in their mouth without washing their hands first. On cross-examination, She explained that "it's typically like a kind of passive or a background exposure." Dr. Farst stated that when there is methamphetamine and amphetamine together, it is generally a clear indicator that at least some of the exposure resulted from the introduction of methamphetamine into the body.

Dr. Liaqat Ali Abbas, another medical expert, testified that he could not say how the methamphetamine or amphetamine got into the sample but only that it was present. Dr. Abbas did concede he believed the levels were consistent with environmental exposure.

Ashley Morse, a friend of Dukes's, also testified for the State. She testified that she would stay with Dukes from time to time and that every time she stayed there, she and Dukes would get high together inside the house. Morse also testified that Dukes continued to ask her for methamphetamine after MC1's death.

After hearing all the evidence, the jury found Dukes guilty on every count, including the enhancement on the first-degree-murder charge because it was committed in the presence of a child. The jury then sentenced Dukes to 480 months of incarceration in the Arkansas Division of Correction on count 4 with a 120-month enhancement; and 120 months of incarceration on counts 1–3. The jury ordered that the sentences for counts 1 and 4 should run consecutively to each other, and the sentences for counts 2 and 3 should run concurrently to 1 and 4, for a total sentence of 720 months' incarceration. This appeal followed.

## II. *Preservation*

We first address the preservation issue. A motion for directed verdict is a challenge to the sufficiency of the evidence. *Porchay v. State*, 2021 Ark. App. 64, 616 S.W.3d 699. To preserve a sufficiency argument for appellate review, a defendant must move for directed verdict at the close of the State's evidence and again at the close of all evidence, and the motion must state the specific grounds therefor. Ark. R. Crim. P. 33.1(a), (c) (2025). The

supreme court and this court have repeatedly held that a defendant must specifically apprise the circuit court of the particular element of the offense that the State has failed to prove. A general motion or one asserting only that the State failed to prove an element without any specific discussion is insufficient. *See, e.g., Mosier v. State*, 2023 Ark. App. 469; *Porchay, supra*. Moreover, Rule 33.1 is strictly construed. *Mosier, supra*.

In the instant case, Dukes moved for directed verdict, as applicable to the claims before us:

> The elements of 513-210 require that the State show that she caused methamphetamine to be ingested or otherwise administered and introduced into [MC3] on or about March 30th. And although a hair follicle test came back as positive for methamphetamine, they put forth no evidence of exactly how that meth ~ methamphetamine was introduce ~ introduced. *Arms v. State*, differentiates active versus passive process of introducing that, and a mother giving birth versus exposure through the environment or otherwise. There's been no testimony or evidence that the defendant smoked in the presence of her children, or that she directly caused them to inject methamphetamine, and therefore, move for a directed verdict.

> Additionally, the State's required to show that she purposely introduced the substance into her body, and there's been no testimony to show that she intentionally did this for [the children].

> . . . .

> The State's required to show that she purposely and directly introduced that substance into [MC1 and MC2], although there ~ they did have a hair follicle that came back as positive and results from [MC1] came back as positive for methamphetamine, there was no evidence or testimony that [Dukes] purposely or directly introduced that into [MC2].

> . . . .

> We would also move for a directed verdict as to count 4, murder in the first degree, because the first prong of that requires that the State show a prima

facie case for the introduction, and in the course of and in furtherance of that charge caused the death of [MC1].

Essentially, this could be compared to a robbery in which somebody is robbing a convenience store, and a cashier is killed in the process of that person fleeing. There's been no evidence that Rachael intentionally introduced that methamphetamine into [MC1] that caused his death at that time.

The State argues that because Dukes failed to articulate other methods of exposure to methamphetamine other than "smok[ing] in the presence of her children, or that she directly caused them to inject methamphetamine," she has not preserved the broad argument that "the State's proof that methamphetamine was inside or otherwise introduced into the bodies of MC2 or MC3" was insufficient. We find that Dukes has preserved her arguments because she did specifically argue that "they put forth no evidence of exactly how that meth -- methamphetamine was . . . introduced." Dukes, however, did not preserve the argument that inability to know when MC2 and MC3 were exposed to the methamphetamine erodes the sufficiency of the evidence for these claims. Accordingly, that argument is not preserved.

The State's preservation argument finds more solid ground when it comes to Dukes's argument that her first-degree-murder conviction is preserved. At no point does Dukes argue that the murder was not done in the furtherance of the underlying felony—the introduction of a controlled substance into MC1. Accordingly, Dukes's argument on appeal that there was insufficient evidence to support the conviction of first-degree murder under the felony-murder theory is not preserved for appeal. The only argument that could conceivably have

been preserved is Dukes's assertion that the State failed to prove that Dukes intentionally gave MC1 the methamphetamine. Dukes, however, does not raise this issue on appeal.

### III. *Sufficiency of the Evidence*

Dukes argues both that the evidence was insufficient to support her convictions for counts 2, 3, and 4 and that the circuit court erred when it allowed testimony of the DHS investigator concerning her prior dealings with DHS. Double-jeopardy concerns require us to first address the sufficiency challenges. *Taffner v. State*, 2018 Ark. 99, at 5, 541 S.W.3d 430, 434. Preservation of an appellant's right to freedom from double jeopardy requires a review of the sufficiency of the evidence before a review of trial errors. *Harris v. State*, 284 Ark. 247, 681 S.W.2d 334 (1984) (discussing *Burks v. United States*, 437 U.S. 1 (1978)).

It is well settled that we treat a motion for a directed verdict as a challenge to the sufficiency of the evidence. *Farris v. State*, 2021 Ark. App. 191, at 4, 620 S.W.3d 559, 561–62. Evidence is sufficient if it is substantial. *Id.* Substantial evidence is that which is of sufficient force and character that it will compel a conclusion without resort to speculation or conjecture. *Id.* On review, the evidence is viewed in the light most favorable to the verdict, and only evidence supporting the verdict will be considered. *Keys v. State*, 2021 Ark. App. 469, at 6, 636 S.W.3d 835, 839.

Our supreme court has explicitly held that evidence of passive ingestion is insufficient to support a conviction for introduction of a controlled substance into the body of another. *Arms v. State*, 2015 Ark. 364, at 8, 471 S.W.3d 637, 642. Specifically, the *Arms* court held:

9

> [U]nder the [canon] of construction *ejusdem generis*, which provides that "when general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words," *section 5-13-210 cannot be construed to include such a passive process. See Edwards v. Campbell*, 2010 Ark. 398, 370 S.W.3d 250. The other enumerated conduct criminalized by section 5-13-210, "to administer or cause to be ingested, inhaled" *entail an active undertaking to dose another person with a controlled substance*. Thus, "otherwise introduced" must be interpreted to refer to an active process. . . . Our construction of criminal statutes is strict, and we resolve any doubts in favor of the defendant. *Heikkila v. State*, 352 Ark. 87, 98 S.W.3d 805 (2003). The courts cannot, through construction of a statute, create a criminal offense that is not in express terms created by the Legislature. *Id.* We do not have the authority to declare that an act is within the criminal laws of this state by implication. *Id.*

*Id.* at 8, 471 S.W.3d at 642–43 (emphasis added). Accordingly, absent evidence that Dukes actively caused MC2 and MC3 to ingest or inhale methamphetamine or otherwise introduced it into their bodies, there is insufficient evidence to support Dukes's conviction on these charges. The jury heard that Dukes had methamphetamine around the home, readily accessible by MC2 and MC3. The jury heard that MC2 had both methamphetamine and amphetamine in her system, which indicated that the methamphetamine had been metabolized. The jury also heard Dukes's confession that she dropped methamphetamine into MC1's bottle and did not wash it out. The jury did not hear, however, any evidence that Dukes actively administered methamphetamine to MC2 or MC3. Unlike MC1, MC2 and MC3 were old enough to walk, crawl, and touch surfaces on their own accord. Absent any evidence, the jury was required to resort to speculation and conjecture to reach its verdict. Such a "verdict is not supported by substantial evidence, and we must reverse and dismiss the charges." *Id.* at 7–8, 471 S.W.3d at 642.

## IV. *Prior DHS Involvement*

Dukes next argues that the circuit court erred when it allowed into evidence DHS testimony regarding its prior contacts with Dukes. Rule 404(b) of the Arkansas Rules of Evidence is titled "Other Crimes, Wrongs, or Acts" and provides as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Ark. R. Evid. 404(b) (2019). The first sentence provides the general rule excluding evidence of a defendant's prior bad acts, while the second sentence provides an exemplary, but not exhaustive, list of exceptions to that rule. *Hamm v. State*, 365 Ark. 647, 232 S.W.3d 463 (2006).

The analysis of whether evidence is admissible under Rule 404(b) is not resolved in a vacuum. While evidence of other crimes or bad acts may be independently relevant and therefore admissible under Rule 404(b), that evidence must also be probative and satisfy Rule 403. *Cash v. State*, 2026 Ark. 16, at 5–6, 727 S.W.3d 614, 618. This court gives considerable leeway to the circuit court to determine whether the circumstances of the prior crimes and the crimes at hand are sufficiently similar to warrant admission under Rule 404(b). *Sasser v. State*, 321 Ark. 438, 902 S.W.2d 773 (1995).

Arkansas Rule of Evidence 403 provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or

11

needless presentation of cumulative evidence." Our supreme court has noted that evidence offered by the State in a criminal trial is likely to be prejudicial to the defendant to some degree, otherwise it would not be offered. *Rounsaville v. State*, 2009 Ark. 479, 346 S.W.3d 289. Nevertheless, the evidence should not be excluded under Rule 403 unless the defendant can show that the evidence lacks probative value in view of the risk of unfair prejudice. *Cash*, 2026 Ark. 16, at 5–6, 727 S.W.3d at 618.

This court reviews a circuit court's ruling under Rule 403 for an abuse of discretion. *Id.* While the Rule 404(b) evidence here may have been prejudicial, as most Rule 404(b) evidence is, the question under Rule 403 is whether its probative value was substantially outweighed by the danger of unfair prejudice. *Kelly v. State*, 2025 Ark. App. 519, at 17–18. Furthermore, the harmless-error doctrine applies to any error under this umbrella. *Cash*, 2026 Ark. 16, at 5–6, 727 S.W.3d at 618.

Part of Dukes's defense was that she did not intentionally, or even negligently, give methamphetamine to MC1. The DHS records in this case were necessary to show prior instances in which Dukes was notified of the danger her drug use had on her children. The records were further necessary to illustrate that Dukes had been advised not to use methamphetamine in the home around the children. We cannot say that the circuit court manifestly abused its discretion when it allowed the DHS investigator to testify to DHS's prior contacts with Dukes.

Even if we determine that the circuit court erred when it allwed the testimony, any error is harmless. Lieutenant Wing testified that Dukes spoke with him about her prior issues

with DHS. Dukes told Lieutenant Wing how she was able to pass DHS's drug tests despite being an active methamphetamine user. Dukes also told Lieutenant Wing how and where she would hide the methamphetamine she kept in her home so that DHS caseworkers would not find it when they searched her home. This testimony was heard by the jury without objection from Dukes. Accordingly, any prejudice that arose from the DHS investigator's testimony was minimal since the jury had already heard about Dukes's previous contacts with DHS.

In sum, we find that Dukes did not preserve her argument that there was insufficient evidence to support her first-degree-murder conviction. We reverse and dismiss Dukes's convictions for introduction of a controlled substance into the body of another as it relates to MC2 and MC3 due to insufficient evidence. Finally, we find that the circuit court did not err when it allowed the DHS investigator to testify about Dukes's prior contacts with DHS.

Affirmed in part; reversed and dismissed in part.

HARRISON and VIRDEN, JJ., agree.

*Wilkinson Law Firm*, by: *Bryan Altman*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Rebecca Kane*, Ass't Att'y Gen., for appellee.